UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARGARET MOLLOY, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 785 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| ACERO CHARTER SCHOOLS, INC., HEALTHPRO HERITAGE, LLC, WALLACE MANAGEMENT CORPORATION, and MELISSA SWEAZY, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Margaret Molloy alleges in this suit that Acero Charter Schools, Inc., Santiago School Principal Melissa Sweazy, and staffing agencies HealthPro Heritage, LLC and Wallace Management Corporation illegally retaliated against and terminated her from her teaching job for voicing concerns about violations of disability-related laws and for refusing to participate in activities that would violate those laws. Doc. 1. The complaint asserts claims under § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, 42 U.S.C. § 1983, the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/1 *et seq.*, and common law retaliatory discharge. Acero and Sweazy move under Civil Rule 12(b)(6) to dismiss the claims against them. Doc. 27. Their motion is denied.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred

1

to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Molloy's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Molloy as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

HealthPro and Wallace are staffing agencies that place educational professionals in schools. Doc. 1 at ¶ 10. One or both agencies arranged an interview of Molloy by Acero's Special Education Director. *Id*. at ¶ 17. Molloy was hired the next day and assigned as a Full-Time Reading Specialist at Santiago School, *ibid*., a public charter school operated by Acero, *id*. at ¶ 12. Molloy began work on March 5, 2018. *Id*. at ¶ 18.

Shortly thereafter, Molloy identified various practices at Santiago School that, she believed, violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., and other laws requiring public educators "to identify students in need of special education, follow prescribed processes when diagnosing a student with a specific learning disability, and once identified, provide those qualifying students with an Individual Education Plan or 'IEP.'" *Id*. at ¶ 21. Specifically, Molloy believed that Acero was failing to follow the "multi-tiered system of supports," or "MTSS," system that Santiago School implemented to comply with its legal obligations. In Molloy's understanding, federal and Illinois law require public schools to follow an MTSS approach to assessing, diagnosing, and developing interventions for students who might have learning disabilities. *Id*. at ¶ 22. MTSS requires that students be sorted into tiers based on their educational needs, with Tier 1 being a "general education program," Tier 2

consisting of "targeted intervention or students not making adequate progress in Tier 1," and Tier 3 adding "intensive, supplemental, individualized intervention for students not responding to Tier 2 instruction." *Id*. at ¶ 23.

Based on available data, Molloy determined that certain Santiago School students needed appropriate MTSS interventions and instruction. *Id*. at ¶¶ 28-29. But when Molloy suggested interventions to Sweazy and teacher Elizabeth Kruger, she was told that they were unnecessary. *Ibid*. Molloy then immediately began voicing concerns that the school's refusal to conduct appropriate interventions violated state and federal law. *Id*. at ¶ 29.

Molloy also asked that she be allowed to conduct intensive interventions for Tier 3 students in seventh and eighth grade, and Sweazy and Kruger again refused her request. *Id.* at ¶¶ 31-32. Once again convinced that the school's refusal violated the law, Molloy began reporting her concerns to several teachers and administrators, including Sweazy, Santiago Case Manager and Resource Teacher Amanda Haas, Santiago Instructional Coach Kate Calhoun, Santiago Case Manager and Resource Teacher Rebecca Gasser, and Acero Section 504/Title II Coordinator Bridgette Sprovieri. *Id*. at ¶¶ 33, 35, 37. Molloy also raised her concerns outside Acero and Santiago School—to Caroline Morrison, her supervisor at HealthPro/Wallace. *Id*. at ¶ 34. In addition to speaking out about her concerns, Molloy refused to conduct interventions that she believed were improper under the law. *Id*. at ¶¶ 35-36.

As a result of her actions, Molloy was subjected to retaliatory measures, including verbal reprimands and discipline, exclusion from meetings, heightened scrutiny related to scheduling and hours, and demeaning comments. *Id*. at ¶ 38. Although Molloy was excluded from IEP eligibility meetings—which, given her role, she ordinarily would have attended—she nonetheless attended an April 11, 2018 meeting. *Id*. at ¶¶ 39-40. At that meeting, Molloy said

that the student under discussion had been improperly diagnosed with a specific learning disability and did not meet the legal requirements to receive an IEP. *Id*. at ¶ 41. In response, teachers and administrators present expressed their disapproval at her participation and suggestion. *Ibid*.

On April 13, 2018, Molloy was fired due to her reporting of activity she deemed unlawful and her refusal to participate in educational activities she deemed unlawful. *Id*. at ¶ 43.

## Discussion

### I. Section 504 and ADA Claims

The ADA's antiretaliation provision states, in relevant part: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018) (emphasis omitted) (quoting 42 U.S.C. § 12203(a)). The Rehabilitation Act incorporates the ADA's substantive standards for retaliation claims. *See* 29 U.S.C. § 794(d). To state a retaliation claim under either statute, a plaintiff must allege that: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Guzman v. Brown Cnty.*, 884 F.3d 633, 642 (7th Cir. 2018); *see also Anderson v. Donahoe*, 699 F.3d 989, 995 (7th Cir. 2012) (setting forth the same requirements for a retaliation claim under the Rehabilitation Act).

The "act or practice" opposed by a plaintiff need not actually violate the ADA or Rehabilitation Act for the plaintiff's complaint about that act or practice to be covered by their antiretaliation provisions. Rather, the antiretaliation provisions apply so long as the plaintiff acted "in good faith and with a reasonable and sincere belief that he or she is opposing unlawful discrimination." *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998) (emphasis omitted); *see also ibid.* ("[I]n retaliation cases … under … the ADA, it is good faith

4

and reasonableness, not the fact of discrimination, that is the critical inquiry.") (internal quotation marks omitted). Nor must the plaintiff have a disability to bring a retaliation claim, as the antiretaliation provisions plainly bar discrimination against "*any* individual"—and not just against individuals with disabilities—for opposing unlawful acts or practices. 42 U.S.C. § 12203(a) (emphasis added); *see Wilbanks v. Ypsilanti Cmty. Schs.*, 742 F. App'x 84, 87 (6th Cir. 2018) ("The anti-retaliation provisions of the ADA and [Rehabilitation Act] grant standing [sic] to non-disabled persons who are retaliated against for attempting to protect the rights of the disabled."); *Barker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 826-28 (9th Cir. 2009) (holding that a special education teacher who "engaged in activities opposing her school's special education policies that allegedly violated the ADA … had standing [sic] to pursue her claim under [the ADA's retaliation] clause"); *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 48 (1st Cir. 2000) (holding that a mother stated a Rehabilitation Act retaliation claim where she alleged that the defendant school system retaliated against her for trying to enforce her disabled child's rights); *MacFarlan v. Bd. of Educ. Sch. Dist. 65*, 904 F. Supp. 2d 852, 854 (N.D. Ill. 2012) (holding that a teacher's claim seeking recovery under the Rehabilitation Act for actions taken against her for "oppos[ing] allegedly-disability-based discrimination against the students under her charge" was sufficient to state a claim).

Molloy's allegations suffice to state a retaliation claim under the ADA and the Rehabilitation Act. The complaint alleges that Molloy had a good faith, reasonable belief that Acero's failures to properly execute the MTSS program violated the law, that she complained of those failures, and that she was fired due to her complaints. Doc. 1 at ¶¶ 21-22, 25, 43, 48, 51-52. The court understands Molloy's position to be that the disability laws she cites, taken as a whole, require schools to implement a comprehensive intervention system like MTSS, and that a

5

failure to properly implement MTSS violates those laws. Doc. 36 at 4. Given that those laws detail an array of requirements for implementing a system to identify and evaluate students suspected of having disabilities, that Acero schools implemented MTSS to comply with their obligations, and that the alleged deficiencies concern core parts of the MTSS system, Molloy's belief that Acero and Sweazy were violating the law appears reasonable and sincere, at least through the lens applicable at the pleading stage. No more is needed to survive a motion to dismiss.

In any event, although Acero and Sweazy argue that Molloy's understanding of disability law is wrong, they do not maintain that it was unreasonable or that she did not hold her beliefs in good faith. Acero and Sweazy therefore forfeited any argument that Molloy lacked a good-faith, reasonable belief that the complained of acts or practices were unlawful. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").

## II. First Amendment Retaliation Claim

### A. Whether Molloy's Speech Was Protected by the First Amendment

Molloy alleges that her complaints about Acero's and Sweazy's conduct were protected speech under the First Amendment. "For a public employee's speech to be protected under the First Amendment, the employee must show that (1) [she] made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) [her] interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and

6

efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotation marks omitted); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."). Thus, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (quoting *Garcetti*, 547 U.S. at 421). "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Ibid*. (internal quotation marks omitted). "The determination of whether speech is constitutionally protected is a question of law." *Ibid*.

For an employee's speech to fall outside the First Amendment's scope, it is not enough that the speech took place "inside [an] office, rather than publicly," or that it "concerned the subject matter of [the plaintiff's] employment." *Garcetti*, 547 U.S. at 420-21; *see also Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) ("[T]he fact that … speech was entirely internal does not itself render the speech unprotected.") (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979)). The key question, rather, is whether the speech was made "pursuant to [the employee's] official duties," *Garcetti*, 547 U.S. at 420-21, that is, whether the speech "owe[d] its existence to a public employee's professional responsibilities," *id*. at 421-22; *see also Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2474 (2018) ("When an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer. The employee is effectively the employer's spokesperson.").

Settled law establishes when a public employee's report of official wrongdoing is protected by the First Amendment. If a public employee reports official misconduct in the manner directed by official policy, to a supervisor or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected by the First Amendment. *See Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 346-47 (7th Cir. 2017) (where a police officer complained to his employer about racial profiling and unlawful disciplinary action within the force); *Kubiak*, 810 F.3d at 481-82 (7th Cir. 2016) (where a police officer reported to her supervisor, her office director, and her Internal Affairs Division that a colleague "verbally assaulted" her); *Fairley v. Andrews*, 578 F.3d 518, 522 (7th Cir. 2009) (where Cook County Jail guards filed internal complaints in the manner required by General Orders); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1091 (7th Cir. 2008) (where an Illinois Gaming Board administrator reported agency misconduct to "a legislative committee responsible for overseeing the [Gaming Board's] activities"); *Vose v. Kliment*, 506 F.3d 565, 570-71 (7th Cir. 2007) (where a police sergeant reported misconduct to his supervisors); *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007) (where a detective reported colleagues' alleged misconduct to his supervisor, as required by established policy); *Spiegla v. Hull*, 481 F.3d 961, 965-67 (7th Cir. 2007) (where a correctional officer reported other officers' violations of prison security rules to a supervisor, consistent with official policy). By contrast, if an employee testifies about misconduct to a jury or grand jury, or reports misconduct outside official channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 793-94 (7th Cir. 2016) (where a police officer reported improperly voided citations to fellow officers and to an outside agency despite lacking the express obligation to do so); *Chrzanowski v.*

*Bianchi*, 725 F.3d 734, 739-40 (7th Cir. 2013) (where a county prosecutor testified under subpoena before a grand jury and at trial regarding alleged wrongdoing by his supervisors); *Chaklos v. Stevens*, 560 F.3d 705, 709-12 (7th Cir. 2009) (where an Illinois State Police ("ISP") employee protested an ISP contract award to an ISP procurement official, rather than to the individuals—the Attorney General of Illinois and the chief procurement officer—required by the Illinois Procurement Code); *Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008) (where a county jail social worker reported to the city police, and not to the county sheriff, that a county correctional officer hit her).

Molloy's allegations support the reasonable inference that she engaged in protected First Amendment speech. Her speech indisputably addressed a matter of public concern: the proper diagnosis and education of public school students with disabilities. *See Thompson v. Bd. of Educ. of Chicago*, 711 F. Supp. 394, 402 (N.D. Ill. 1989) ("[Q]uality of education and conditions in the Chicago public schools constitute matters of vital public concern."); *Sorescu v. Harper*, 2017 WL 1927696, at *7 (N.D. Ill. May 10, 2017) (same). In any event, Acero and Sweazy forfeited any argument to the contrary by not disputing that proposition. *See M.G. Skinner & Assocs.*, 845 F.3d at 321; *G & S Holdings*, 697 F.3d at 538; *Alioto*, 651 F.3d at 721. Nor do Acero and Sweazy suggest that countervailing state interests justified the adverse actions taken against Molloy, thereby forfeiting that point as well.

The only remaining question is whether Molloy has adequately alleged that she spoke as a private citizen rather than pursuant to her official duties. Molloy's internal reports to Principal Sweazy, Doc. 1 at ¶¶ 31-33, and to Acero's Section 504/Title II coordinator, *id*. at ¶ 37, are properly characterized as internal complaints, closely tied to her work and made to supervisors or individuals charged with oversight—and thus are not entitled to First Amendment protection.

9

But Molloy also alleges that Acero retaliated against her for complaints made to coworkers and, more significantly, to the staffing agency that placed her at Santiago School. Complaints about an employer's conduct, made to an outside staffing agency that must determine whether to maintain its ongoing relationship with the employer, cannot—at least on the present allegations and through the lens applicable on a motion to dismiss—properly be characterized as purely internal or made pursuant to official reporting obligations.

Acero and Sweazy disclaim any argument that Molloy, like a police officer, was under "some general duty to report misconduct." Doc. 41 at 6-7. Instead, they submit that Molloy's "speech lacks constitutional protection because it pertained to her specific duties to identify students in need of MTSS interventions and to implement such interventions." *Id*. at 7. But speech does not fall outside the First Amendment simply because it "pertains" to an employee's official duties. *See Garcetti*, 547 U.S. at 411 ("The dispositive factor … is not that … the [expression] concerned the subject matter of [the plaintiff's] employment."). Rather, as noted, "the controlling factor is [whether the employee's] expressions were made pursuant to [her] official duties." *Ibid*. For the reasons just given, Molloy's speech to the staffing agency, at the very least, was not made pursuant to her official duties.

### B. *Monell* Liability Against Acero

Molloy's First Amendment claim against Acero, an operator of public charter schools, is governed by the municipal liability standards set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). "A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. A municipality only may be held liable under § 1983 for constitutional violations caused by the municipality itself through its own policy or custom." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). To state a *Monell*

claim, the plaintiff must allege facts sufficient to show that a municipal employee's unconstitutional act was caused by: "(1) an express [municipal] policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citation omitted); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must allege causation, meaning that the municipality, "through its deliberate conduct, … was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis omitted).

Molloy alleges that Acero is liable under *Monell* because she was fired both (1) by a "final policymaker" and (2) pursuant to a "widespread practice" of retaliation. Doc. 36 at 8-10. Molloy need only allege facts adequate under one of those theories for her claim to survive a motion to dismiss, and because her allegations satisfy the "final policymaker" theory, there is no need to consider the "widespread practice" theory at this juncture.

"State law determines who legally constitutes a final policymaker." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). "Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). A person has final policymaking authority for employment purposes if she has authority to set policy for hiring and firing. *See id*. at 739 ("There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."). The complaint alleges that

"Sweazy possessed and was delegated final policymaking authority for personnel issues arising within the Santiago School," Doc. 1 at ¶ 14; that Acero (through Sweazy) fired Molloy in retaliation for protected speech, *id*. at ¶¶ 43, 55-60; and that Acero ratified Sweazy's conduct in so doing, *id*. at ¶ 60. Those allegations suffice at the pleading stage to state a *Monell* claim against Acero under a "final policymaker" theory. *See Kristofek*, 712 F.3d at 987 (holding that allegations that the police chief "was fully in charge of the police department and that his firing decisions were not reviewed" were sufficient to infer at the pleading stage that the chief had final policymaking authority over hiring and firing).

In pressing the contrary result, Acero argues that a provision of the Illinois School Code, 105 ILCS 5/10-21.4a, divests school principals of personnel-related policymaking authority, and instead vests such power exclusively in the school board. Doc. 28 at 10; Doc. 41 at 9-10. Acero's argument fails because 105 ILCS 5/10-21.4a does not govern charter schools like the Santiago School. *See* 105 ILCS 5/27A-5(g) (providing that charter schools are exempt from "all … State laws and regulations in this Code governing public schools and local school board policies," except for specific provisions not pertinent here). Rather, a charter school principal's authority is governed by the charter school's board or other governing body (here, Acero) consistent with the school's charter. *See* 105 ILCS 5/27A-5(c) ("A charter school shall be administered and governed by its board of directors or other governing body in the manner provided in its charter."). The complaint alleges facts suggesting that Acero's governing body administered and governed Santiago School in a manner that granted Sweazy final policymaking authority over personnel decisions like Molloy's termination. Doc. 1 at ¶ 56. Absent any argument that Acero's charter rendered that delegation impossible, Molloy's *Monell* claim against Acero survives dismissal under a "final policymaker" theory.

C.     Sweazy's Assertion of Qualified Immunity

Sweazy argues that even if Molloy adequately alleged that her firing violated the First Amendment, Sweazy is entitled to qualified immunity. Doc. 28 at 10-11. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. … A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (internal quotation marks omitted). "Because a qualified immunity defense so closely depends on the facts of the case, a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Id*. at 548 (internal quotation marks omitted); *see also Tamayo*, 526 F.3d at 1090 ("[W]e have cautioned that the rule that qualified immunity must be resolved at the earliest possible stage must be tempered by the notice pleading requirements of Rule 8.") (citations omitted).

The complaint alleges that Molloy's protected speech activities—at a minimum, her external complaint to the staffing agencies working with Acero—motivated Sweazy to fire her. At all relevant times, "[t]he law [wa]s settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out." *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012) (alteration omitted) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). It follows, at least at the pleading stage, that Sweazy is not entitled to qualified immunity.

Other than her argument that Molloy's speech was not in fact protected by the First Amendment, Sweazy offers only the suggestion that a right must be "clearly established in a

13

particularized … sense" for a claim to survive qualified immunity. Doc. 28 at 11 (quoting *Landstrom v. Ill. Dep't of Children & Family Servs.*, 892 F.2d 670, 674-76 (7th Cir. 1990)). But Sweazy provides no explanation—other than her and Acero's legal argument, already rejected above—for why that standard has not been met here. Sweazy accordingly has forfeited any further argument that the First Amendment right invoked by Molloy was not clearly established at the time Sweazy acted. *See M.G. Skinner & Assocs.*, 845 F.3d at 321; *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped.").

## III. IWA Claims

Molloy alleges that Acero and Sweazy violated § 15 of the IWA by retaliating against her because of her complaints, and that they violated § 20 of the IWA by retaliating against her because of her refusal to participate in illegal activities.

### A. Section 15 Claim

Section 15 provides, in pertinent part: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS § 174/15(b). "[T]o establish a cause of action under section 15(b), the employee must show (1) an adverse employment action by his or her employer, (2) which was in retaliation (3) for the employee's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. 2017).

The complaint alleges that Molloy reported suspected violations of federal and Illinois law to Santiago's principal (Sweazy), Doc. 1 at ¶¶ 29-36, and also to Acero's Section 504/Title II Coordinator (Sprovieri), *id*. at ¶ 37. The complaint further alleges that Acero, as an operator of

public schools, is a governmental body. *Id*. at ¶ 15. And the complaint alleges that after Molloy made her complaints, Acero and Sweazy retaliated against her. *Id*. at ¶ 68. That is all the complaint needs to do to state a § 15 claim.

Contrary to Acero and Sweazy's submission, *Sweeney* does not require that a § 15 plaintiff report the alleged legal violation to a government entity other than her employer. Rather, "the plain language of the Act supports" "a cause of action for disclosing suspected unlawful activity to one's own employer who also happens to be a government or law-enforcement agency." *Brame v. City of N. Chicago*, 955 N.E.2d 1269, 1271 (Ill. App. 2011). *Sweeney* stands only for the proposition that a plaintiff is generally not protected under § 15 if she merely reports a violation to the very person who committed the act in question. *See Sweeney*, 79 N.E.3d at 189-90 (distinguishing Sweeney's allegations from those in *Brame* because Sweeney did not report the violator's wrongdoing to the wrongdoer's supervisor, but instead merely told the wrongdoer that his acts were improper). Here, the complaint alleges that Molloy reported wrongdoing to Acero's Section 504/Title II Coordinator and to Sweazy. At the very least, Molloy's report to the Section 504/Title II Coordinator renders *Sweeney* inapposite.

**B.     Section 20 Claim**

Section 20 provides: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act." 740 ILCS § 174/20. To plead a § 20 claim, "a plaintiff must [sufficiently allege] (1) a refusal to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) [that] the employer retaliated against the employee because of said refusal." *Roberts v. Bd. of Trs. Cmty. Coll. Dist. No. 508*, 105 N.E.3d 923, 933 (Ill. App. 2018), *rev'd in*

15

*part on other grounds*, 2019 IL 123594 (Ill. 2019). In so doing, a plaintiff "must identify a law, rule or regulation that her employer asked her to violate." *Young v. Alden Gardens of Waterford, LLC*, 30 N.E.3d 631, 643 (Ill. App. 2015).

The complaint alleges that Acero was obligated under the IDEA, 34 C.F.R. § 300.304, and certain sections of the Illinois Administrative Code to follow MTSS procedures for identifying students with learning disabilities and for implementing proper interventions. Molloy takes the position—as does, according to the complaint, the Illinois State Board of Education ("ISBE")—that those laws mandate the use of an MTSS intervention and diagnosis process. Doc. 1 at ¶¶ 21-22. And the complaint alleges that Molloy refused to conduct interventions she understood to be unlawful and refused to facilitate the improper identification of a student as having a particular learning disability. *Id*. at ¶ 66.

Acero and Sweazy argue that the complaint does not state a § 20 claim because it "fails to identify a provision within said regulations that any of the Defendants supposedly asked Plaintiff to violate." Doc. 28 at 14. But they cite no authority for the proposition that a plaintiff must identify not only the section of the cited statute or regulation, but the particular subsection, to state a § 20 claim, thereby forfeiting the argument. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 n.3 (7th Cir. 2008) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority … forfeits the point.") (internal quotation marks omitted). In any event, Molloy identifies a practice— diverging from MTSS requirements—and alleges that it violated the law. And Molloy properly identifies the specific laws and regulations she claims that practice violated.

Acero and Sweazy also argue that the actions in which Molloy refused to participate would not actually have been unlawful. Somewhat unhelpfully, Acero and Sweazy develop that

16

argument only in responding to Molloy's ADA and Rehabilitation Act retaliation claims, for which the answer does not matter. In any event, they do not do enough to rebut Molloy's understanding of why those actions would have been unlawful. Instead, Acero and Sweazy contend that "MTSS … is not required by federal law," observe that Molloy does not identify specific students with disabilities to whom she was unable to provide MTSS interventions, and argue that the ISBE does not require MTSS interventions to be delivered in any prescribed manner. Doc. 28 at 5-6. The first point is presented without development or explanation. The second, as Molloy notes, Doc. 36 at 5, misapprehends the thrust of her complaints—that Acero's deficient MTSS processes prevented her from properly identifying students with disabilities in the first place. And as to the final point, Acero and Sweazy may be correct that the law does not require perfect adherence to any particular MTSS process. But given that MTSS was the system in place at Santiago School for ensuring compliance with governing law, and given that some of Molloy's allegations concern substantial deficiencies in core features of that system—disability diagnosis and the provision of interventions to students with disabilities—Acero and Sweazy must do more at the pleading stage to rebut the commonsense inference that the failures alleged here, viewed in the light most favorable to Molloy, would violate the law.

Accordingly, Molloy has adequately pleaded a § 20 claim.

### IV. Common Law Retaliatory Discharge Claim

To state a common law retaliatory discharge claim, Molloy must allege that: "(1) [her] employer discharged [her], (2) in retaliation for [her] activities, and (3) that the discharge violates a clear mandate of public policy." *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019) (quoting *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009)). "Actions that are protected by the public policy of Illinois" include "retaliation for complaints about an employer's unlawful conduct." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277

F.3d 936, 940-41 (7th Cir. 2002). Like the antiretaliation provisions of the ADA and the Rehabilitation Act, the retaliatory discharge tort "does not require the employee to have been correct about the unlawfulness of the conduct, as long as she had a good-faith belief that it was unlawful." *Ibid*. Accordingly, the common law retaliatory discharge claim survives dismissal for the same reasons as do the ADA and Rehabilitation Act retaliation claims.

## Conclusion

Acero and Sweazy's motion to dismiss is denied. They shall answer the complaint by October 24, 2019.

October 10, 2019

United States District Judge